### UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHRISTINA L. MATTICOLA,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Civil Action No. 07-0338 (CKK)** |
| ) | |
| **DEPARTMENT OF THE AIR FORCE,** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

### DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR
### PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE,
### MOTION FOR A CONTINUANCE OF BRIEFING SCHEDULE

The Defendant, Department of the Air Force, through its undersigned attorneys, hereby

files its Opposition to Plaintiff's Motion for Partial Summary Judgment.  In the alternative, the

Defendant moves, pursuant to Fed. R. Civ. P. 56(f), for a continuance of the briefing schedule to

allow limited discovery in this case.  In support of its Opposition and Motion for a Continuance,

the Defendant submits a Memorandum of Points and Authorities, a Statement of Material Facts

As To Which the Defendant Asserts There Are Genuine Issues, and the Declarations of Leyla B.

Gillett and Captain Kyle Little, United States Department of the Air Force.

Respectfully submitted,

_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney

_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney

_____/s/_____

JUDITH A. KIDWELL
Assistant United States Attorney
555 Fourth Street, N.W.- Civil Division
Room E4905
Washington, D.C. 20530
(202) 514-7250

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____
                                                    )
CHRISTINA L. MATTICOLA,                )
                                                    )
                    Plaintiff,                      )
                                                    )
        v.                                          )        Civil Action No. 07-0338 (CKK)
                                                    )
DEPARTMENT OF THE AIR FORCE,   )
                                                    )
                    Defendant.                      )
_____ )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT**
**OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION**
**FOR PARTIAL SUMMARY JUDGMENT OR, IN THE ALTERNATIVE**
**DEFENDANT'S MOTION FOR A CONTINUANCE OF BRIEFING SCHEDULE**

**I.  BACKGROUND**

The Plaintiff's unverified Complaint ("Compl.") was filed on February 13, 2007.  The

Complaint alleges that on March 18, 2006, the Defendant intentionally and willfully disclosed

information contained in a system of records protected by the Privacy Act, 5 U.S.C. § 552a.

Compl.  ¶¶ 5, 12.  The Plaintiff alleges that a SSgt Wahln [sic] ("Ms. Waln"), formerly of the

U.S. Department of the Air Force ("USAF"), while stationed in Yokota, Japan, disclosed

information from a system of medical records maintained by the Defendant.  Ms. Waln, who at

the time was assigned to the USAF's base hospital, is alleged to have publicly disclosed a record,

indicating that the Plaintiff had tested positive for a sexually transmitted disease ("STD"), during

an altercation between the Plaintiff and Ms. Waln at the USAF's Enlisted Club in Yokota, Japan

("Enlisted Club"). Compl. ¶ 12.

On March 19, 2007, the Plaintiff filed a motion for partial summary judgment along with

a statement of material facts as to which the Plaintiff contends there is no genuine issue.  No

other supporting documents were filed with the Plaintiff's motion for partial summary judgment,

nor does the motion contain any citations to the record.  For the reasons discussed below, the

Defendant submits that the Plaintiff has failed to establish that she is entitled to partial summary

judgment.  Accordingly, the Plaintiff's motion for partial summary judgment should be denied.

Alternatively, the Defendant requests a continuance to allow the Defendant to conduct limited

discovery in this case.

**ARGUMENT**

**II.  THE PLAINTIFF'S MOTION FOR PARTIAL**
**SUMMARY JUDGMENT SHOULD BE DENIED**

**A.**      **Standard for Summary Judgment**

A party is entitled to summary judgment if the pleadings, depositions, and affidavits

demonstrate that there is no genuine issue of material fact in dispute and that the moving party is

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty*

*Lobby, Inc*., 477 U.S. 242 (1986).  A genuine issue of material fact is one that would change the

outcome of the litigation.  *Id*. at 247.  The party seeking summary judgment bears the "initial

responsibility of informing the district court of the basis for [its] motion, and identifying those

portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together

with the affidavits which [the party] believe[s] demonstrate the absence of a genuine issue of

material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).   In response, the non-moving

party must then "go beyond the pleadings and by [the party's] own affidavits, or depositions,

answers to interrogatories, and admissions on file 'designate' specific facts showing that there is

a genuine issue for trial."  *Id.* at 324 (internal citations omitted).

2

In addition, Local Civil Rules provide that:

> [A] motion for summary judgment shall be accompanied by a statement of material facts as to which the moving party contends there is no genuine issue, which shall include references to the parts of the record relied on to support the statement.

LCvR 7(h), 56.1.  These local civil rules supplement Fed. R. Civ. P. 56, by setting forth specific procedures for the parties to follow in moving for or opposing summary judgment, and this circuit has upheld strict compliance with these local rules when invoked by a district court.  *See Burke v. Gould*, 289 F.3d 513, 517- 519 (D.C. Cir. 2002).  In fact, a district court may strike pleadings not in conformity with these rules.  *See Id*. at 517; *see also Robertson v. American Airlines*, 239 F. Supp.2d 5 (D.D.C. 2002) (the court struck defendant's motion for summary judgment for failure to comply with Local Civil Rules).

B.    **The Plaintiff's Motion Is Unsupported**

The Plaintiff has filed an unverified complaint, a statement of material facts as to which the Plaintiff contends there is no genuine dispute, and a motion for partial summary judgment without any affidavits, declarations, citations to the record, or other supporting documents.  In fact, the Plaintiff's  motion was filed even before the Defendant was given time to file its answer.[1]  No discovery has been conducted in this case.

Although "[M]ere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment," *Williams v. Callaghan*, 938 F.Supp. 46, 49 (D.D.C. 1996), the Defendant submits that the Plaintiff's unsupported motion for partial summary judgment does not meet the standard of a "proper" motion and fails to conform

---

[1] The Defendant filed its answer on May 1, 2007, denying substantial allegations in the Plaintiff's complaint.

3

to the requirements of the rules of this Court. Given this lack of support for the Plaintiff's motion, the Defendant submits that the burden has not shifted from the Plaintiff to the Defendant to set forth specific facts showing there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(c). Accordingly, the Plaintiff's motion for partial summary judgment should be denied.

**C.    There Are Genuine Issues of Material Fact**

In any event, the Defendant submits that there are genuine issues of material fact in this case. In support of its opposition and motion, the Defendant has:  (1) filed an answer denying critical allegations of the Plaintiff's complaint; (2) submitted a Statement of Genuine Issues; and (3) submitted two Declarations.  The Defendant submits that all of these demonstrate that there are genuine issues of fact in this case, and evidence from which the factfinder could find in the Defendant's favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249-50; *Laningham v. United States Navy*, 813 F.2d 1236, 1242 (D.C. Cir. 1987).

**1.    The Privacy Act**

The Privacy Act regulates the "collection, maintenance, use, and dissemination of information" about individuals by federal agencies.  Privacy Act of 1974, Pub. L. No. 93-579, § 2(a)(5), 88 Stat. 1896, 1896.  "The Act gives agencies detailed instructions for managing their records and provides for various sorts of civil relief to individuals aggrieved by failures on the Government's part to comply with the requirements."  *Doe v. Chao*, 540 U.S. 614, 618 (2004).

Only records that are maintained within a "system of records" are subject to the Privacy Act.  The Act defines "system of records" to mean "a group of any records under the control of any agency from which information is retrieved by the name of the individual or by some identifying number, symbol, or other identifying particular assigned to the individual."  5 U.S.C.

4

§ 552a(a)(5).

The Privacy Act prohibits disclosure of any individual's "record" that is contained in a "system of records" to another person without the individual's consent, subject to certain exceptions. *See* 5 U.S.C. § 552a(b).  If an agency discloses a record in violation of the Privacy Act "in such a way as to have an adverse effect on an individual," and if the "agency acted in a manner which was intentional or willful," then that individual may recover "actual damages." 5 U.S.C. §§ 552a(g)(1)(D), (g)(4)(A); *see also Doe v. Choe*, 540 U.S. at 626.

As recognized by the Court in *Schmidt v. Department of Veterans Affairs*, 218 F.R.D. 619 (E.D. Wis. 2003), the Privacy Act does not define the term "disclose."  However, "the term has been defined as 'imparting of information which in itself has meaning and which was previously unknown to the person to whom it was imparted.'"  *Schmidt v. Department of Veterans Affairs*, 218 F.R.D. at 630 (quoting *Harper v. United States*, 423 F.Supp. 192, 197 (D.S.C. 1976)).  As pointed out by the Court in *Schmidt*, "Black's Law Dictionary defines the term 'disclose' as 'to bring into view by uncovering; to expose, to make known.'"  *Schmidt v. Department of Veterans Affairs*, 218 F.R.D. at 630 (quoting *Black's Law Dictionary*, at 464 (6th ed. 1991)).

Moreover,  the Privacy Act requires that a plaintiff  show that he or she suffered an "adverse effect" by an improper disclosure of a record.  *See* 5 U.S.C. § 552a(g)(1)(D).  Only after establishing "the injury-in-fact and causation requirements of Article III standing" can a plaintiff withstand a motion to dismiss for lack of standing.  *See Doe v. Choe*, 540 U.S. at 624, 625.

2. <u>**The Defendant's Declarations Demonstrate That There Are Genuine Issues of Fact**</u>

a. <u>Declaration of Leyla B. Gillett</u>

Ms. Gillet is a non-commissioned officer in charge of the clinical laboratory at the base hospital. *See Affidavit[2] of Leyla B. Gillett* (hereafter referred to as "Declar. L. Gillett"), ¶ 1. She has held that position for twelve years, and, because of her official duties, Ms. Gillett is familiar with the Air Force's Privacy Act Program and the privacy provisions of the Health Insurance Portability and Accountability Act. *Id.*

As part of her official duties, Ms. Gillet is responsible for the administration of various clinical tests, including urine and blood tests for various medical conditions including, infectious diseases such as chlamydia and other sexually transmitted diseases ("STDs"). *See Declar. L Gillett*, ¶ 2. In order to run blood tests, Ms. Gillett and her laboratory staff draw blood and perform tests on samples of the blood or send the blood sample to an outside laboratory. *Id.* Ms. Gillett and her laboratory staff are made aware of the type of tests that they are performing, but do not have access to patients' medical records. *Id.* Laboratory staff are not informed of the specific reasons that tests are being requested. *See Declar. L Gillett*, ¶ 3. Requests for testing of patients are sent to the laboratory by computer from medical providers, and the results of the tests are provided by laboratory staff only to the requesting healthcare provider. *See Declar. L Gillett,* ¶ 2.

Although Ms. Gillet knew the Plaintiff, because of the fact that the Plaintiff had at one time worked at the hospital, Ms. Gillet and the Plaintiff were not "close friends." *See Declar. L*

---

[2] Although styled as an "affidavit" the statement was made pursuant to 28 U.S.C. § 1746, and is, therefore, a declaration.

*Gillett*, ¶ 4.  Sometime in the spring of 2006, the Plaintiff went to the clinical laboratory.  *Id*.  Ms. Gillett had received instructions to run a series of tests on the Plaintiff for STDs, but Ms. Gillette was not given any reason for the tests on the Plaintiff.  *Id.*

When the Plaintiff came into the laboratory, she was escorted by Ms. Gillett to a room for the drawing of her blood.  *Id*.  At that point, the Plaintiff told Ms. Gillett that the Plaintiff had contracted chlamydia from her husband, who had been unfaithful.  *Id*.  Ms. Gillett was shocked by the Plaintiff's revelation.  *Id.*

Ms. Gillett saw the Plaintiff several weeks later at the Enlisted Club.  *See Declar. L Gillett*, ¶ 5.  At the time, Ms. Gillett was with Ms. Waln and witnessed two altercations between the Plaintiff and Ms. Waln.  *Id.*  During the second altercation, Ms. Gillett heard Ms. Waln state that the Plaintiff had chlamydia.  *Id.*  At the time of Ms. Waln's statement, the only other person that Ms. Gillette remembers being in the vicinity of the women was a Ms. Susana Fields.  *Id.*

After Ms. Waln's statement, the Plaintiff went immediately to a telephone and attempted to call her First Sergeant to report Ms. Waln.  *Id.*  The Plaintiff did not appear distressed in any way with the disclosure itself, but appeared determined to report the disclosure to the authorities. *Id.*

b. Declaration of Captain Kyle W. Little

Ms. Waln received disciplinary action by the USAF for her assault of the Plaintiff and for the remarks made about the Plaintiff's STD at the Enlisted Club.  *See Declaration of Captain Kyle W. Little* ("Declar. Capt. Little") ¶ 2.  In her response to the disciplinary action, Ms. Waln denied that she had retrieved the information about the Plaintiff's STD from a medical record. *See Declar. Capt. Little*, ¶¶ 3-4, Exhibits A and B.  Ms. Waln, in fact, asserted that she had heard

7

about the Plaintiff's STD through "hearsay" and "gossip." *Id.*

### 3.  The Plaintiff Has Failed to Establish a Prima Facie Case

In order to establish a prima facie violation of 5 U.S.C. §§ 552a(g)(1)(D) and (g)(4) of the Privacy Act, the Plaintiff is required to prove that the information in question:  (1) is contained in a "record"; (2) the record is maintained in a system of records; (3) the record is retrieved by a personal identifier; and (4)  the agency improperly disclosed the information from the record. *See Henke v. U.S. Dep't of Comm.*, 83 F.3d 1453, 1459-60 (D.C. Cir. 1996); *Fisher v. National Institutes of Health*, 934 F.Supp 464, 468, 472 (D.D.C. 1996).

The Plaintiff alleges that information about her medical condition was contained in a record which was maintained in a system of records by the USAF.  *See Plaintiff's Memorandum of Points and Authorities,* pp. 3-4.  The Defendant does not dispute this point.

In addition, the Plaintiff argues that because Ms. Waln worked at the base hospital, she must have obtained the information concerning the Plaintiff's STD from the Plaintiff's medical record.  *See Plaintiff's Memorandum of Points and Authorities*, p. 2, 4-5.  The Plaintiff also alleges that Ms. Waln's remarks about the Plaintiff's STD were heard by a number of "servicemembers and their dependents."  *Id* at p. 2.

However, the Plaintiff has provided no evidence to support her assertions.  More importantly, the Plaintiff's allegations are contradicted by the Defendant's supporting declarations.  Ms. Waln denied that she obtained information about the Plaintiff's medical condition from a medical record.  Furthermore, Ms. Gillett states that it was the Plaintiff who told Ms. Gillett about the Plaintiff's STD.  *See Declars. Capt. Little*, ¶ 3, Exhibits A and B, and *Declar. L. Gillett* ¶ 4.

8

These statements create a genuine issue as to whether the information Ms. Waln had obtained came from a record maintained by the USAF, or was the result of the Plaintiff's disclosure of her medical condition on the Air Force base. Furthermore, given Ms. Gillett's and Ms. Waln's statements, there is a genuine issue as to whether the Plaintiff was adversely effected by Ms. Waln's remark at the Enlisted Club or by gossip on the base concerning the infidelity of her husband and her STD.[3]

Evidence presented by a party opposing summary judgment "is to be believed, and all justifiable inferences are to be drawn in [its] favor. *Anderson v. Liberty Lobby, Inc*., 477 U.S. at 255. While the non-moving party is not required to present its entire case, the non-moving party must satisfy the court that its evidence demonstrates that "an evidentiary conflict [exists] as to the material fact[s] in dispute." *Opryland USA, Inc. v. Great American Music Show, Inc*., 970 F.2d 847, 850 (Fed. Cir. 1992), (citing *Armco, Inc. v. Cyclops Corp*., 791 F.2d 147, 149 (Fed. Cir. 1986)).

The Defendant's supporting documentation demonstrates that there are genuine issues of fact in this case with respect to: (1) whether there was an improper disclosure from a record maintained in a system of records of the USAF; and (2) whether the Plaintiff was adversely effected by the improper disclosure of such a record. Where, as here, the Plaintiff has offered nothing to show that the breach in confidentiality concerning her medical condition stemmed from an improper disclosure of her medical records, she has failed to establish a violation of the Privacy Act. This is especially true in light of the fact that Plaintiff, herself, voluntarily disclosed

---

[3] Ms. Gillett also contradicts the Plaintiff's assertion that Ms. Waln's remark was heard by numerous individuals. Ms. Gillett states that only a few people were in the vicinity of the women when Ms. Waln's statement was made. *See Declar. L. Gillett*, ¶ 5.

9

the information about having contracted a STD, and thus, other individuals could have known of the Plaintiff's medical condition.[4]

### III.  ALTERNATIVELY, THE DEFENDANT SHOULD BE GRANTED A CONTINUANCE TO CONDUCT LIMITED DISCOVERY

Rule 56(f) of the Federal Rules of Civil Procedure provides:

> Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

Fed. R. Civ. P. 56(f).  This rule is intended to protect against "an improvident or premature grant of summary judgment."  See 10B Wright & Miller, *Federal Practice & Procedure*, § 2740, at 402 (1998).  A party seeking discovery bears the burden of identifying the facts to be discovered and that would create a triable issue and the reasons why the party cannot produce those facts in opposition to the pending motion for summary judgment.  *Byrd. v. Envtl. Prot. Agency*, 174 F.3d 239, 248 n. 8 (D.C. Cir. 1999); *see also Strange v. United States Arms Control & Disarmament Agency*, 864 F.2d 859, 861 (D.C. Cir. 1989) (court may order a continuance to permit discovery if the party opposing the motion adequately explains why, at that timepoint, it cannot present by affidavit facts needed to oppose the motion).

The events alleged in the Plaintiff's complaint occurred in Japan.  Because of the distance and time difference between Washington, D.C., and Japan, the Defendant has been hampered in obtaining additional supporting documents to oppose the Plaintiff's motion for partial summary judgment.  Moreover, Ms. Waln, who was thought to have returned to South Dakota, has now

---

[4] There is also a question of whether Ms. Waln's remarks (for which she was disciplined), made at a bar in the Enlisted Club, can be attributed to the Agency under the Privacy Act.

been located in Chandler, Arizona, and could be deposed in the near future.  *See Declar. Capt. Little*, ¶ 5.  Additionally, the Plaintiff would have to be deposed concerning information solely in her possession (*e.g.*, who else she told about her STD).

<u>**Conclusion**</u>

For the foregoing reason, the Defendant requests that the Plaintiff's motion for partial summary judgment be denied.  Alternatively, the Defendant requests a continuance to allow limited discovery in this case.

Respectfully submitted,


_____/s/_____

JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/_____

RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_____/s/_____

JUDITH A. KIDWELL
Assistant United States Attorney
555 Fourth Street, N.W.- Civil Division
Room E4905
Washington, D.C. 20530
(202) 514-7250

11

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **CHRISTINA L. MATTICOLA,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )  **Civil Action No. 07-0338 (CKK)** |
| | ) |
| **DEPARTMENT OF THE AIR FORCE,** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## <u>DEFENDANT'S STATEMENT OF GENUINE ISSUES</u>

1.      Admit.

2.      Admit.

3.      Admit.

4.      Deny, except to admit that the Plaintiff was at the Enlisted Club on or about March 18, 2006.  The Plaintiff provides no evidentiary support for the remainder of this paragraph.

5.      Deny, except to admit that while at the Enlisted Club, SSgt Waln did state that the Plaintiff had chlamydia.  This paragraph contains immaterial information.  Furthermore, the Plaintiff provides no evidentiary support.

6.      Deny that SSgt Waln obtained the information about the Plaintiff's sexually transmitted disease from medical records maintained by the U.S. Department of the Air Force.  *See Declar. Capt. Little*, ¶¶ 3-4, Exhibits A and B. Further, the Plaintiff has provided no evidentiary support.

7.      Admit.

8.      Deny.  Further, the Plaintiff has provided no evidentiary support.

Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. BAR # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, D.C. BAR # 434122
Assistant United States Attorney


_____/s/_____
JUDITH A. KIDWELL
Assistant United States Attorney
555 Fourth Street, N.W.- Civil Division
Room E4905
Washington, D.C. 20530
(202) 514-7250

2

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| CHRISTINA L. MATTICOLA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    Civil No. 1:07cv00338 (CKK) |
| | ) |
| THE DEPARTMENT OF THE AIR FORCE, | ) |
| | ) |
| Defendant. | ) |

<u>**DECLARATION OF CAPTAIN KYLE W. LITTLE**</u>

I, Captain Kyle W. Little, in lieu of an affidavit, as permitted by 28 U.S.C. § 1746, declare as follows from personal knowledge:

1.  I am a Trial Attorney assigned to the Air Force Legal Operations Agency (AFLOA) – General Litigation Division, Information Litigation Branch, United States Air Force, Arlington, Virginia. As such, I am detailed as Agency Counsel representing the interests of the Air Force in litigation, assisting the assigned Assistant United States Attorney. I have been assigned to this location since January 2006. I have been on Active Duty in the Office of The Staff Judge Advocate since July 2000. I have extensive knowledge of Air Force procedures regarding discipline and training. I am currently detailed as Agency Counsel for the case of <u>Matticola v. Department of the Air Force</u>, in the United States District Court for the District of Columbia.

2.  On March 15, 2007, I made a request to the Civil Law Chief at 374 AW/JA (the Legal Office at Yokota Air Base, Japan). I requested various records and documents, including any information on discipline for then Staff Sergeant Troi Waln-Johnson ("Ms. Troi Waln"). One set of documents received in response to my request

–1–

consisted of disciplinary action records concerning Ms. Waln.  The records show that on

June 9, 2006, Lieutenant Colonel Leslie M. Claravall, 374th Medical Operations

Squadron commander, offered Non-Judicial Punishment (UCMJ, Article 15) to

SSgt Waln-Johnson for violations of UCMJ, Article 128, assault, (for unlawfully shoving

Mrs. Matticola on the back with her hand), and UCMJ, Article 92, dereliction of duty, (for

disclosing Mrs. Matticola had a STD).

    3. In her statement of response to the Article 15 action, SSgt Waln-Johnson

        stated:

> As for the accusation that I retrieved medical information from any source
> within the Medical Group, I am not guilty...I would never retrieve
> information from any file or system for future use to divulge or harm her in
> any way.  The information I had was through third party gossip amongst a
> group of people.

    See Exhibit A.

    4. On June 19, 2006, Lieutenant Colonel Claravall found that SSgt Waln-

Johnson committed both alleged offenses and reduced her by one grade, to Senior

Airman, and reprimanded her.  In her statement appealing the punishment, SSgt Waln-

Johnson stated:

> In reference to the comment that I divulged unapproved medical
> diagnosis, I would like to reiterate the fact that I did not obtain this
> information from any patients file.  The comment I made to said individual
> was completely and totally 'hearsay.'  I had no prior knowledge as to
> whether or not rumors of this individual were true.

    See Exhibit B.

    5. Although we were originally notified that SSgt Waln-Johnson was living in

South Dakota, we have now located her in Chandler, Arizona.

I declare under penalty of perjury that the above is true and correct.

Executed on April 26, 2007.

_Kyle W. Little_

Kyle W. Little, Capt, USAF
Trial Attorney

MEMORANDUM FOR 374 MDOS/CC

FROM: SSgt Troi L. Waln-Johnson

SUBJECT: Response to Article 15 Action

1. Ma'am, I have consulted with Captain Daly, the Area Defense Counsel, and I have decided to waive my right to trial by court martial and accept non-judicial punishment proceedings under Article 15 of the Uniform Code of Military Justice. I offer this statement as evidence for you to consider before you make a final determination as to the resolution of this matter.

2. On 18 March 2006, I went to dinner with friends for my birthday where I had two alcoholic beverages. After dinner, we went on base to the Enlisted Club with the same group of friends and consumed two more alcoholic beverages. While I was in the club, I was approached by Christina Matticola, an individual whom I had a few past negative encounters with. In the past, I have always treated Mrs. Matticola with respect even if she was rude behavior or disrespect. I have always kept a clear head and responded to her in a positive manner and walked away. On this night she approached me stating, "Hey, I just want to apologize for the way I've acted." Regretfully, I reacted completely out of character and began to blurt out vulgar remarks and repeated "gossip" and "hearsay." I do not frequent the clubs nor do I drink much. I did not judge the amount of alcohol I consumed during the short time period and feel this was the one and only reason for my behavior. I normally know how to deal with these types of situations.

3. I feel that I am a very compassionate and caring person. It is never my intention to harm any individual physically or emotionally as this goes completely against my beliefs and they way I teach and raise my family. I cannot explain why I reacted in this manner. I am remorseful and sorry for what I have done.

4. As for the accusation that I retrieved medical information from any source within the Medical Group, I am not guilty. I do recall Mrs. Matticola being in the Med Group however cannot recall what she was seen for that day. I would never retrieve information from any file or system for future use to divulge or harm her in any way. The information I had was through third party gossip amongst a group of people.

5. I do feel that I am an asset to the Air Force and I have numerous accomplishments. I received the Sharp Troop Award from my Group Superintendent, CMSgt Leslie McGowan in the field during an exercise. She approached my supervisor SSgt Loretta Wade and told her to make note that within the Medical Group and in the field I worked hard and maintained professionalism. I was then invited by CMSgt McGowan to assist her on her events coordination as I continuously took time to decorate the medical group hallways and lobbies in my off duty time during holidays and special events. My duty section generally won first place awards for participation and creativity. I was deployed to Saudi Arabia in 2000 for a three month tour. During that time I was selected to be on the base honor guard team. I was coined by 14th Chairman of the Joint Chiefs of Staff, General Shelton for professionalism while escorting him to lunch during his visit to Saudi Arabia. With the new "Primary Care Optimization (PCO) concept", as SrA I was selected as the lead 4A for the new "SILVER TEAM" to coordinate and implement the 4A position. I spent a few months there with much

*Exhibit A*

success. Because of my knowledge as a 4A, I was asked to return to the outpatient records section as NCOIC of outpatient records, replacing a technical sergeant and a civilian supervisor. Although I could not officially rate or write packages, I successfully managed 13 airmen between the records section and the central appointment line. During my time in outpatient records, I also performed part time duties as the squadron secretary during a transition period. I did this with much success as well. With recommendation from my Squadron Commander, I was selected by the 355th Wing Commander as assistant NCOIC of the First Term Air Center. I successfully ran the program serving alone because the NCOIC was deployed. I was recognized as NCO of the Quarter 2002, at Incirlik Air Base Turkey. I was selected by 39th Medical Group Commander, Col Payne to perform duties as Medical Group secretary during the base Non-combatant Evacuation Operation (NEO). I have had several letters of appreciation throughout my career. I am an intelligent individual and a hard worker. I give my best to obtain the greatest outcome in any project given to me.

6. Ma'am, a reduction in rank would greatly affect me both personally and financially. I feel that I have given a great deal to the military and have earned my rank as a Non-Commissioned Officer (NCO) and feel it would be detrimental to me emotionally. I have put in a great deal of effort to get where I am today. I also feel that forfeitures and extra duty would greatly affect my family. Aside from my normal duties and monthly expenses, I would like to add that I am a single mother of two teenagers whom are very active in our community. I take great pride in the fact that I have raised two respectable hard working children. They are involved in many activities. My 13 year old son joins every sport he can and is a member of the local boy scouts. Throughout her high school years my 16 year old daughter has served as both the first sergeant and commander of JROTC. She is also involved in sports and volunteer services. I devote a great deal of time to my family in order for them to be the respectable citizens they are today. With this in mind please consider that this requires a great deal of time on my part and there are also many expenses involved as I pay for uniforms, dining outs, fees, travel expenses and anything else that should come with their activities. I have had some setbacks throughout this assignment but do feel that I can overcome them and be a successful NCO.

7. Thank you for your time and consideration in this matter.

TROI L. WALN-JOHNSON, SSgt, USAF

MEMORANDUM FOR LT COL LESLIE M. CLARAVALL

FROM: SrA Troi L. Waln-Johnson

SUBJECT: Appeal to Article 15 Action

1. Ma'am, I'm appealing the nonjudicial punishment imposed upon me. The basis for my appeal is that the punishment is disproportionate to the offense.

2. I feel that the punishment is disproportionate due to my history. I feel that I have given a great deal to the military both personally and professionally. I have had my successes and setbacks, most recently the incident with Mrs. Matticola. I would first like to point out the fact that her statement is not a complete and true statement. I did not physically assault her, nor did I provoke the verbal altercation as she stated. I am understanding to the fact that whether I am provoked or not it is still wrong to engaged in arguments leading to someone getting hurt. This is normally the case with Mrs. Matticola as my family and my career are what are my two main priorities. In reference to the comment that I divulged unapproved medical diagnosis, I would like to reiterate the fact that I did not obtain this information from any patients file. The comment I made to said individual was completely and totally "hearsay." I had no prior knowledge as to whether or not rumors of this individual were true. My fit of anger is by no means an excuse for the things I said to this individual and I take full responsibility for and am apologetic for the slanderous remarks I made. I have had several negative encounters with this individual in which I continuously disregarded and kept to myself knowing her attitude and disrespect. Also knowing my position as an NCO, I always knew to keep within my boundaries. I feel the built up negative emotions and tension came to a final blow when this individual approached me once again. Without stopping, thinking and considering the outcome, I repeated the one and only thing I had heard about this individual outside the Medical Group. This was way out of character for me and I allowed my anger to put my family and myself in the position I am in today. This has been a very hard lesson for me as I work very hard in teaching my children respect for others and society. I know now not to allow my anger to take control and do what I have always done and just walk away from these types of situations.

Although unbecoming, I feel there underlies a reason for the lack of good judgment in my situation. I was unaware of the effects the amount of alcohol I drank would affect me as I am a very casual drinker and limit myself to one or two drinks at dinner or from time to time at home. I do not offer this as an excuse, rather as an unintentional mistake. One I will never make again. I would personally define my character in this situation as remorseful and the experience life changing. I am very ashamed of what I have done and regardless of any decisions made, I will continue to conduct myself in a respectful manner and do my best to rectify any wrong doings.

I do respect the fact that you have a duty to address my poor conduct and that action should be taken, however I would like to impress upon you the tremendous affect a reduction in rank would have on my family.

Exhibit B

We have had many setbacks during out time here at Yokota. I have recently gone through a divorce and had to settle on my portion of the shared bills. Because I needed to settle as quickly and painlessly as possible I made large lump sum payments to my ex husband, so have only been able to make minimum payments to my own personal bills. My personal bills are of a numerous amount added to my monthly cost of living expenses. I have just recently returned from emergency leave which also created a large debt for my family. I feel that a reduction in rank would create a tremendous hardship for my family financially. On a personal level we have had many things to overcome in the last year and have made great strides towards our independence and well being. I feel that until this incident we were just overcoming our emotional hardships and becoming stronger as a family. I personally have endured some severe emotional distress and depression and had only just begun to address and repave my road to success. I just do not feel as though my family can endure much more on either end of the spectrum. As a role model to my children I feel that this would be detrimental to the values I have instilled. My son is moving up in the ranks as a boy scout and has been a great role model to his peers. My daughter as well has advanced as a first sergeant and commander for the JROTC program. Although they are only in their high school and middle school years, I feel that my career as an NCO has been a big part of their lives and I would love nothing more than to overcome this obstacle and continue to be a good role model to my children.

3. I believe your decision will be easier if you know my background. I am Sicangu Lakota from the Rosebud Sioux Tribe of South Dakota. My family has been dedicated to promoting a non-violent community and teaching basic respect for life. This incident does not reflect the traditional values I was raised by, nor does it reflect my true self and character. I understand the dynamics of abuse in many forms.

As a civilian, I spent 7 years as office manager and advocate for the White Buffalo Calf Woman Society, a shelter for battered women and children. I also served two years as a volunteer through the Volunteers In Service To America (VISTA) program, where I successfully developed the "Teen Women Society," a program for young women dealing with physical, emotional and sexual abuse. I worked for the Casey Family Program, a long term foster care program also as an advocate for children.

I eventually joined the United States Air Force and feel that I have been an asset as I have accomplished the following throughout my career.

I received the Sharp Troop Award from My Group Superintendent, CMSgt Leslie McGowan in the field during an exercise. She approached my supervisor SSgt Loretta Wade and told her to make note that within the Medical Group and in the field I constantly worked hard and maintained professionalism. I was then invited by CMSgt McGowan to assist her on her events coordination as I continuously took time to decorate the Med Group hallways and lobbys on my own time during holidays and special events. My duty section generally won first place awards for participation and creativity.

I was deployed to Saudi Arabia in 2000 for a three month tour. During that time I was selected to be on the base honor guard team. I was coined by 14th Chairman of the Joint Chiefs of Staff, General Shelton for professionalism while escorting him to lunch during his visit to Saudi Arabia.

With the new "PCO concept", as SrA I was selected as the lead 4A for the new "SILVER TEAM" to coordinate and implement the 4A position. I spent a few months there with much success. Because of my knowledge as a 4A, I was asked to return to the outpatient records section as NCOIC of Outpatient records, replacing a TSgt and a civilian supervisors. Although I could not officially rate or write packages, I successfully managed 13 airmen between the records section and the central appointment line.

During my time in outpatient records, I also performed part time duties as the squadron secretary during a transition period. I did this with much success as well. With recommendation from my Squadron Commander, I was selected by the 355 Wing Commander as assistant NCOIC of the First Term Air Center. I successfully ran the program serving alone as the NCOIC was deployed to the dessert.

NCO of the third quarter 2002, Incirlik Air Base Turkey.

Was selected by 39th Medical Group Commander, Col Payne to perform duties as Medical Group secretary during the base NEO.

I have had several letters of appreciation throughout my career.

I spent a great portion of my life advocating on violence against women, whether it be mental, physical or emotional and have always strived to live a peaceful life. I have always been a respectful person and been considerate to other peoples feelings and emotions. I have shamefully asked myself many times why I reacted in the manner that I did. My behavior is not something I could explain to myself or anyone else. I have sought counseling on this issue as I have had so many regrets and hurt so much over what I had done. I felt as though the character described to me on that evening was that of a completely different person...someone I didn't know.

Ma'am, I do not provide any of this information as an excuse to my behavior, however I do believe that I am a good citizen and that I do deserve to be given the opportunity to prove that I have learned some great lessons from this experience. I also feel that I have given wholeheartedly to my community both as a civilian and as and an active duty military member. In any event, violence is a non-tolerable act and should not be taken lightly, however I ask that I be given the opportunity to continue to resolve this matter in a another from. As a personal choice I have begun counseling sessions and if given the opportunity, I would like to seek more guidance and therapy to improve my lifestyle and the standards set before me.

4. For all the reasons above, I respectfully request that you withdraw the Article 15. I am sure your decision will be judicial and fair, and I thank you for taking the time to consider my appeal.

TROI L. WALN-JOHNSON, SrA, USAF

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

CHRISTINA L. MATTICOLA,           )
                                  )
    Plaintiff,                    )
                                  )
    v.                            )    Civil No. 1:07CV0038
                                  )
DEPARTMENT OF THE AIR FORCE,      )
                                  )
    Defendant                     )
_____ )

### AFFIDAVIT OF LEYLA B. GILLETT

Pursuant to 28 U.S.C. § 1746, I, Leyla B. Gillett, hereby
declare under penalty of perjury that the following is true and
correct.

1.   I am currently the Non-Commissioned Officer in Charge
(NCOIC) of the Clinical Laboratory at the 374th Medical Support
Squadron, Yokota Air Base, Japan.  I have held this position for
approximately the last 12 months.  Prior to holding this
position, served in the same clinical laboratory as the
Assistant NCOIC.  I held that position for approximately 1 year.
Because of my official duties, I am familiar with the Air Force
Privacy Act Program and the privacy provisions of the Health
Insurance Portability and Accountability Act (HIPAA).

2.   As the NCOIC of the Yokota Air Base Clinical
Laboratory, I am responsible for the administration of various
clinical tests.  These tests include testing blood and urine for
diabetes, cholesterol level, and infectious diseases to include
sexually transmitted diseases (STD).  In order to run these
tests, myself and the other laboratory personnel I supervise,

1

draw blood or collect other bodily fluids; we will then test these samples if the laboratory is capable of performing the test. If the laboratory is not capable of performing the test, the sample is sent to an outside laboratory. The laboratory personnel are aware of the type of tests they are performing, and will be informed of the results; however, they are not provided access to the patient's medical records. The request for testing comes to the laboratory via computer from the medical provider. Laboratory personnel do not take a patient's history or ask any other questions of the patient other than what is necessary to collect the requisite sample from the patient. Furthermore, the results of these tests are only provided to the healthcare provider who requested the test.

3. There are several reasons the laboratory may test a patient for an STD. First, the patient may be exhibiting symptoms of an STD. Second, the person may have tested positive for one or more STDs. In both of the above situations, the laboratory typically receives orders from the provider, via computer, to test the patient for other STDs as a precautionary measure. Third, a patient may not have tested positive for an STD, but may have been identified as a person who has come into contact with a person who is known to have a STD. This testing is accomplished as a Public Health function. In all of the above situations, laboratory personnel are not informed of the specific reason the test is being requested. The laboratory personnel are only informed of the type of tests that are to be conducted. The test results are then received by laboratory personnel who subsequently inform the provider who requested the test.

4. Sometime during the Spring of 2006, Christina L. Matticola entered the Clinical Laboratory. Although I knew Ms. Matticola because she used to work at the hospital, I did not

2

consider us to be a 'close friends.'  My relationship with her
was strictly an 'at work' relationship.  I was instructed, as
with any patient, to run a series of tests on her for STDS.  I
did not know, nor was I informed via any medical record, of the
reason for the requested tests.  However, due to the nature of
the tests I could assume that she was there because she had
either contracted an STD or had come into contact with someone
who had an STD.  After she entered the laboratory I took her to
a room where I would withdraw her blood for testing.  At that
point Ms. Matticola voluntarily informed me that she had
contracted Chlamydia.  She stated that she had contracted it
from her husband because he had cheated on her.  This disclosure
shocked me because I did not consider Ms. Matticola to be a
close friend and I felt that the information she was disclosing
to me was private information.

    5.  The next time I saw Ms. Matticola was several weeks
later at the Yokota Enlisted Club.  During that time I was with
Ms. Troi Waln-Johnson.  During the evening I witnessed Ms.
Matticola and Ms. Waln-Johnson engage in 2 verbal altercations.
The first was at the bar in the club where Ms. Matticola and Ms.
Waln-Johnson started arguing.  However, they were soon
separated.  The second incident occurred shortly thereafter
where I again witnessed Ms. Matticola and Ms. Waln-Johnson
engaged in a verbal altercation.  During that altercation, I
heard Ms. Waln-Johnson say Ms. Matticola had contracted
Chlamydia.  After Ms. Waln-Johnson made that statement, Ms.
Matticola went straight to the telephone and tried to call her
First Sergeant and report Ms. Waln-Johnson's statement.  The
only other people around at that time were Ms. Susana Fields and
myself. I am not certain if there were other people around.
TSgt Toby Nielson later walked up but I do not know if he heard
Ms. Waln-Johnson's earlier statements.

Ms. Matticola did not appear distressed in any way with the disclosure but rather appeared determined to report the disclosure to the authorities.

Executed this 23rd day of April 2007.

LEYLA B. GILLETT

4